**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MARGARET MCCRARY, Individually and on Behalf of All Other Persons Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED, <br> Defendant. | Civil Action No.: <br><br> 1:23-cv-10768 <br><br> **JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiff Margaret McCrary ("Plaintiff") brings this class action for breach of contract on behalf of herself and a Class of persons or entities who maintained Merrill Edge retirement accounts at any time beginning March 17, 2022.

Plaintiff's allegations are based on information and belief, except where the allegations specifically identify documents on which the allegations are based or Plaintiff's personal knowledge of facts. Plaintiff's information and belief is based on the investigation of her counsel, including the review of materials on Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill")'s websites (www.ml.com, www.merrilledge.com, and www.mymerrill.com), historical materials available on the internet; materials on competitors' websites; media reports; interest rate data compiled by Curinos, a subsidiary of Informa plc, and by Crane Data; stock analyst reports concerning sweep rates; Securities and Exchange Commission ("SEC") releases, rules, and regulations; Financial Industry Regulatory Authority ("FINRA") rules and regulations; and New York Stock Exchange ("NYSE") rules and regulations.

## PRELIMINARY STATEMENT

1.      Merrill requires that each Merrill Edge client agree online to the Merrill Edge Self-Directed Investing Client Relationship Agreement ("CRA").  The CRA describes Merrill's "Sweep Program" with Bank of America, N.A. ("BANA"), a Merrill affiliate, and states that "[t]he interest paid on retirement account assets will be at no less than a reasonable rate."

2.      The CRA forms a contract between Merrill on the one hand and retirement account customers on the other hand and requires Merrill to pay a "reasonable rate of interest" on "retirement account assets."

3.      Merrill's contractual obligation to pay retirement account investors a reasonable rate of interest is also supported by other of Merrill's account agreements.  *See*, *e.g.*, ¶¶31-34, *infra*.

4.      Merrill breached the terms of the CRA and other retirement account agreements and failed to pay investors a reasonable rate of interest on cash in retirement accounts.  Rather, as market interest rates rose beginning in March 2022 and into 2023, Merrill paid tier 1 and 2 retirement account investors (those investors with less than $1 million of assets under management) ("AUM") only 0.01% APY (annual percentage yield) interest on their cash.  ***That is equivalent to $1 of interest on $10,000 in cash per year***.  IRA investors with greater AUM fared only modestly better.  Investors with between $1 million and $10 million in AUM (tier 3) were paid a high of only 0.30% APY, beginning on November 7, 2022.  IRA investors with greater than $10 million in AUM (tier 4) were paid a high of only 1.06% APY, beginning on November 7, 2022.

5.      During the period starting March 17, 2022 (when the Federal Reserve began raising the target federal funds rate) through the present, swept cash had a significantly higher

reasonable value than the amounts paid by Merrill on sweep accounts.  Comparable brokerages such as Fidelity Investments, R.W. Baird, Robinhood, and Vanguard Investments, which did not sweep cash to affiliated banks, but rather swept cash to independent, unaffiliated banks, paid a substantially higher rate on swept cash, than Merrill.  Thus, for example, Fidelity paid retirement investors starting in August 2023 as much as 2.72% APY on swept cash regardless of AUM, and R.W. Baird paid retirement investors as of September 8, 2023 2.07% to 4.15% on swept cash depending on cash balances.

6.     In comparison, Merrill consistently paid the lowest rates on swept cash of brokerage firms surveyed by Crane Data and BofA Securities, regardless of whether those brokerages swept cash to affiliated or unaffiliated banks.

7.     Other metrics, including (i) the federal funds ("FF") rate, and rates paid by (ii) online banks, and on (iii) BANA Insured Savings and Preferred Deposit accounts, (iv) government money market funds, and (v) Merrill's NextGen 529 plan, further evidence that the paltry rates paid by Merrill on retirement sweep accounts were not reasonable.

8.     Plaintiff's claims for breach of contract are asserted on behalf of a national Class, under New York State law (based on a choice of law provision in the CRA).

9.     Plaintiff seeks both monetary recovery commencing on March 17, 2022 and declaratory and injunctive relief.  Merrill is committing an ongoing wrong.  Accordingly, the class period for which plaintiff seeks relief is ongoing and includes continuing and future retirement account investors.

10.    There is currently pending before this Court a related action asserting similar claims for relief denominated *Valelly v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* 19-cv-07998 (VEC), filed August 27, 2019.

3

11.     The claims in that action were subject to a document discovery cut-off of October 15, 2021.  The claims in this action are on behalf of investors whose claims accrued after that date.

## PARTIES

12.     Plaintiff, Margaret McCrary, resides in St. Clair Shores, Michigan, and has done so from at least March 17, 2022 through the present.

13.     Defendant Merrill Lynch, Pierce, Fenner & Smith Inc. is a Delaware corporation with its principal executive offices located in New York City, New York.  Merrill is a registered broker-dealer, member of the Securities Investor Protection Corporation ("SIPC"), and a wholly owned subsidiary of Bank of America Corp.

14.     Merrill, among other things, operates the "Merrill Edge" self-directed online investment platform.  According to Merrill's website, Merrill Edge "self-directed investing is intended to be a fully-electronic, internet based brokerage service. This means that all notices, statements, disclosures and other information regarding this service and your account will be sent to you electronically via www.merrilledge.com or to your last designated email address."[1]

## JURISDICTION AND VENUE

15.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(d)(2).  Plaintiff is diverse from Merrill and the amount in controversy exceeds $5 million.

16.     Venue is properly laid in this District under 28 U.S.C. §1391(b).  Merrill maintains its executive office in this District, and many of the acts giving rise to the violations of law complained of herein occurred in this District.

---

[1] https://perma.cc/4GR4-KPNK (last viewed December 8, 2023).

## SUBSTANTIVE ALLEGATIONS

### A.  Sweep Programs, Generally

17.    A "sweep program" is a "service provided by a broker or dealer where it offers to its customer the option to automatically transfer free credit balances in the securities account of the customer to either a money market mutual fund product as described in § 270.2a-7 or an account at a bank whose deposits are insured by the Federal Deposit Insurance Corporation." *See* 17 CFR 240.15c3-3(a)(17).

18.    Sweep deposits provide an important source of capital for banks.  Banks can use the deposits for general corporate purposes, including making loans or investing in government securities. The difference between the interest rate paid on a sweep account and the interest rate earned by a bank on those deposits is known as net interest margin ("NIM").

### B.  Plaintiff's IRA Investments

19.    Plaintiff, in October 2020, opened a Traditional IRA account at Merrill Edge through a transfer from a 401(k) account.

20.    Plaintiff, to her best recollection, opened her IRA account electronically by scrolling through electronic screens and acknowledging consent to the various agreements provided online by Merrill.

21.    To the best of her recollection, and based on the investigation of her counsel, by scrolling through those screens, Plaintiff was required to acknowledge the terms of a Merrill Edge Self-Directed Investing Client Relationship Agreement ("CRA") dated June 2019 (Code 422000PM-0619), and a Traditional IRA Disclosure Statement ("Traditional IRA Agreement") dated September 2018 (Code 209468PM-0918).

22.     The CRA (p. 4, ¶13; entitled "Sweep Program") acknowledged that rates on sweep accounts were set by BANA and other Merrill Affiliated Banks and that the "sweep program" was "financially beneficial to Merrill and its affiliates":

> The deposit of checks, the sale of securities, and other activity will periodically generate cash in your account. You have the option to have cash balances in your account automatically deposited in a bank deposit program ("Sweep Program"). ... Deposits held at Bank of America, N.A. and/or Bank of America California, N.A. (the "Merrill Affiliated Banks") are financially beneficial to Merrill and its affiliates. Interest rates paid on deposits are determined at the discretion of the Merrill Affiliated Banks based on economic and business conditions. Rates may change daily.

23.     The CRA identified the Retirement Account Savings Program ("RASP"), as the applicable sweep program for Merrill Edge retirement accounts.  *Id*., p. 4, ¶13.  Merrill's similar product for non-online, non-Merrill Edge, non-retirement accounts, is the Merrill Lynch Bank Deposit ("MLBD") program. Merrill's product for online, Merrill Edge, non-retirement accounts, is the Merrill Lynch Direct Deposit ("MLDD") program.

24.     At all relevant times, the MLBD, MLDD and RASP tier rates were identical.  The SEC, in its Staff Bulletin:  Standards of Conduct for Broker-Dealers and Investment Advisers Conflicts of Interest, issued August 3, 2022, emphasized that "cash sweep programs" are a "common source[ ] of conflicts of interest."[2]

25.     The Traditional IRA Agreement (p. 38, ¶30), dated September 2018, acknowledged that Merrill had a conflict of interest in sweeping cash to an affiliated entity.  The Traditional IRA Agreement stated that "deposits provide a stable source of funding" and the "borrowing costs incurred to fund the business activities of the Merrill Lynch Affiliated Banks have been reduced by the use of deposits from Merrill Lynch clients.":

---

[2] https://perma.cc/ZA9Y-HWPE (last viewed December 8, 2023).

The Merrill Lynch Affiliated Banks use bank deposits to fund current and new lending, investment and other business activities. Like many other depository institutions, the profitability of the Merrill Lynch Affiliated Banks is determined in large part by the difference between the interest paid and other costs incurred by them on bank deposits, and the interest or other income earned on their loans, investments and other assets. The deposits provide a stable source of funding for the Merrill Lynch Affiliated Banks, and borrowing costs incurred to fund the business activities of the Merrill Lynch Affiliated Banks have been reduced by the use of deposits from Merrill Lynch clients.

26.     Merrill Sweep Program Guide at 4 (MAP5441796 02/2023) emphasizes that Merrill has "conflicts of interest relating to the cash sweep program."[3]

27.     To protect investors because of the conflict of interest and in light of the Internal Revenue Code and ERISA provisions addressing that conflict of interest with respect to retirement accounts, the CRA (p. 4, ¶13) obligated Merrill to pay retirement account investors a reasonable rate of interest on cash swept to the Merrill Affiliated Banks: "The interest paid on retirement account assets will be at no less than a reasonable rate."

28.     Investors in various retirement accounts are required to consent to the CRA.

29.     Among the retirement accounts covered by the CRA that are subject to the reasonable rate provision and are covered by this class action are the Traditional, Roth, Rollover, Inherited, SEP, SIMPLE, and BASIC IRAs.[4]

30.     The CRA added that "New York law governs your agreements and transactions, unless we indicate otherwise."  P. 2, ¶4.

---

[3] https://perma.cc/G422-33GS (last viewed December 8, 2023).

[4] https://perma.cc/H3JF-3D8F (last viewed December 8, 2023).

31.     The Traditional IRA Agreement stated at page 35 that uninvested cash would be invested in RASP and that "[t]he RASP feature makes available to you a money market deposit account, for each Retirement Plan Account which is opened on your behalf at one or more participating depository institutions, the deposits of which are insured by the Federal Deposit Insurance Corporation ('FDIC'), an independent agency of the U.S. Government."

32.     The Traditional IRA Agreement added (at p. 2, ¶7) that "[s]uch investments in deposits of Bank of America, N.A. (BANA), Bank of America California, N.A.(BA-CA) or other Merrill Lynch affiliated bank will bear a reasonable rate of interest as required under the exemption provided by ERISA Section 408(b)(4) or Tax Code Section 4975(d)(4)."[5]  This sentence was deleted in an Amendment to the Traditional IRA Agreement dated January 2023 (209468PM–0123 at p. 2, ¶7).   However, the CRA continued to promise investors a reasonable rate of interest on retirement accounts.

33.     Merrill's Disclosure and Custodian Agreement – Roth Individual Retirement Account[6] effective September 2018 ("Roth IRA Agreement") contained identical provisions with respect to the "reasonable rate of interest," at p. 10, ¶74.  The foregoing sentence quoted in ¶32, *supra*, was similarly deleted in an amendment to the Roth IRA Agreement dated January 2023.

---

[5] The full Paragraph 7 stated:

We'll follow your instructions for all purchases, sales, transfers, exchanges and other disposition of assets. If we don't receive instructions from you, we'll hold assets uninvested and contact you in writing at your last known address. If we can't locate you within two months, we may invest the cash proceeds in a money market fund or interest bearing account, if you don't have a sweep arrangement for cash in your IRA. Such investments in deposits of Bank of America, N.A. (BANA), Bank of America California, N.A.(BA-CA) or other Merrill Lynch affiliated bank will bear a reasonable rate of interest as required under the exemption provided by ERISA Section 408(b)(4) or Tax Code Section 4975(d)(4).

[6] September 2018 Roth IRA Agreement (209581PM-0918).

Again, the CRA continued to promise investors in Roth IRAs a reasonable rate of interest on retirement accounts.

34.     Merrill's Disclosure and Custodial Agreement SIMPLE Retirement Account/Individual Retirement Account (SRA/IRA) currently available on Merrill's website dated December 2021 (306502PM-1221) similarly states:

> With RASP, a money market deposit account is established at Bank of America, N.A., Bank of America California, N.A., and any other Merrill Lynch affiliated bank. Such investments will bear a reasonable rate of interest as required under the exemption provided by ERISA Section 408(b)(4) or Tax Code Section 4975(d)(4).  [P. 10, ¶78]

and

> You authorize the deposit of cash balances in your SRA/IRA in accounts with Bank of America, N.A. America, N.A. or Bank of America California, N.A., or with affiliated or unaffiliated depositary institutions that bear a reasonable rate of interest.  [P. 22, ¶51][7]

35.     Section 4975 of the Internal Revenue Code (entitled "Tax on Prohibited Transactions"), referenced in the Traditional, Roth and SIMPLE IRA Agreements, applies to IRAs generally.  *See* 26 U.S.C. §4975(e)(1)(B) (defining "plan" to include "an individual retirement account described in [IRC] Section 408(a)").

36.     IRC §4975(c)(1)(B) defines as a "prohibited transaction" the "lending of money or other extension of credit between a plan [*i.e.*, an individual IRA] and a disqualified person."

37.     The definition of a "disqualified person," under Section 4975(e)(2) includes, among others, "a person providing services to the plan."   BANA is a "disqualified person" under Section 4975(e)(2).  Thus, the RASP sweep agreement for retirement accounts between Plaintiff and Merrill referenced in the Agreements is a "prohibited transaction" under §4975(c)(1)(B).

---

[7] Merrill's Disclosure and Custodial Agreement SIMPLE Retirement Account/Individual Retirement Account (SRA/IRA) (306502PM-1221) accessible at https://perma.cc/K826-JZ9Q (last viewed December 8, 2023).

Merrill acknowledged as much in its reference to IRC §4975(d)(4) in the Traditional, Roth and SIMPLE Agreements.

38.     IRC §4975(d)(4) provides several "exemptions," or safe harbors, for otherwise "prohibited transactions," one of which is "the investment of all or part of a plan's assets in deposits which bear a reasonable interest rate in a bank or similar financial institution."

39.     Section 4975 recognizes that, even in markets for financial services generally characterized by vigorous competition, related party transactions into which customers are defaulted can offer rates at risk of being depressed by an inherent conflict of interest. Accordingly, conflicted transactions such as affiliated entity cash sweeps are required to pay a reasonable rate of interest. In particular, retirement account customers are vulnerable to being under-compensated for the use of uninvested cash in their accounts. IRC Section 4975 thus seeks to ensure related party transactions involving retirement accounts are priced at fair market rates.

40.     Similarly, ERISA Section 408(b)(1) exempts from prohibition various interested party transactions that "bear a reasonable rate of interest," among other requirements.  *See* 29 U.S.C. §1108(b)(1).

41.     Merrill and BANA failed to differentiate in the interest rate paid based on the reasonable rate provision and paid the same rates of interest on retirement accounts as it paid on non-retirement sweep accounts (MLDD Program for online accounts, tier 1; MLBD Program for brick and mortar accounts, tiers 1-4).

42.     Regulations promulgated by the Department of the Treasury confirm that the cash swept from Merrill to BANA is a "prohibited transaction" but would be permissible (*i.e.*, be within the exemption or safe harbor) if it paid "a reasonable rate of interest." Thus, Treasury regulations state that "Section 4975(d)(4) exempts from the excise taxes imposed by section

4975 investment of all or a part of a plan's assets in deposits bearing a reasonable rate of interest in a bank or similar financial institution…, even though such bank or similar financial institution is a fiduciary or other disqualified person with respect to the plan." 26 C.F.R. §54.4975-6(b)(1).

43.     Treasury regulations also mandate that when a financial institution "invests plan assets in deposits in itself or its affiliates under an authorization contained in a plan or trust instrument," the authorization "must name" the institution and "must state that [it] … may make investments in deposits which bear a reasonable rate of interest in itself (or in an affiliate)." *Id*. §54.4975-6(b)(3).

44.     A March 15, 2017 letter to the Department of Labor from the American Bankers Association (of which BANA is a member), states, matter-of-factly (at 5), that with respect to the investment of IRA assets into "one or more bank deposit products, ... banks have routinely relied on the statutory exemption [for prohibited transactions] available for bank deposit product programs under Section 4975(d)(4) of the Code…."[8] In support of this contention, the ABA attached a white paper from Morgan, Lewis & Bockius LLP, which (at 4) specifically notes that a bank may "invest an IRA's assets in its own deposit accounts" "which bear a reasonable interest rate" pursuant to the exemption "found in Section 4975(d)(4) of the Code and Section 408(b)(4) of ERISA."

45.     Section 4975 and ERISA Section 408 place the burden of demonstrating reasonableness on the financial institution. The principle underlying the reasonable rate provisions—that conflicted transactions, while prohibited, can be made lawful if the "disqualified person" can sustain their burden of proof that the terms were "reasonable"—is

---

[8] https://perma.cc/NGP9-Y845 (last viewed December 8, 2023).

consistent with the well-settled common law principle (in the corporate context, trust context, or otherwise) that a defendant can escape liability arising from its conflict of interest if it can show the challenged action is "entirely fair" to the beneficiary.  Consistent with the common law, the reasonable rate provisions impose on Merrill the burden of demonstrating that the prohibited transaction is nonetheless reasonable.

46.     Other brokerages acknowledge that they are required to pay reasonable rates only on retirement accounts, and that that obligation derives from ERISA Section 408(b)(4) and Internal Revenue Code Section 4975(d)(4).  For example, the E*Trade Financial Retirement Sweep Deposit Account [RSDA] Program Customer Agreement states "I authorize such RSDA Program deposits and understand that each Program Bank will pay a reasonable rate of interest, as contemplated by ERISA Section 408(b)(4) and the regulations under Code Section 4975(d)(4)."[9]

47.     The J.P. MORGAN SECURITIES LLC TRADITIONAL IRA CUSTODIAL AGREEMENT states (at p. 6) similarly with respect to sweep accounts, that J.P. Morgan will pay a reasonable rate pursuant to IRC ¶4975 –

> [T]he Custodian may invest any uninvested cash held in the IRA in bank savings instruments or bank deposits bearing a reasonable rate of interest in JPMCB's banks so long as (to the extent necessary) such investment is in compliance with section 4975(d)(4) of the Code, Treasury regulations section 54.4975-6(b)(1), the class exemption of PTCE 81-8, dated January 23, 1981 or other applicable law.[10]

---

[9] "RSDA Program Customer Agreement," available at https://web.archive.org/web/20220809064349/https://us.etrade.com/e/t/prospectestation/pricing?id=1209047000 (last viewed December 8, 2023).

[10] https://perma.cc/FG6E-JWXV (last viewed December 8, 2023).

48.     While the wording in the Merrill, E*Trade and JP Morgan agreements may differ, they all reflect a government-mandated contractual requirement to pay a reasonable rate to retirement account holders.

49.     Rates paid on RASP are based on tiers "as determined by the value of assets in your eligible Retirement Plan Account(s), Deposit Account(s) and accounts linked through the Merrill Lynch Statement Link service."  Traditional IRA Agreement, p. 37, ¶18.

50.     According to paragraph 19, page 37, of the Traditional IRA Agreement, the "following Asset Tier levels took effect on September 30, 2005: • $10,000,000 or more [tier 4] • $1,000,000 to $9,999,999 [tier 3] • $250,000 to $999,999 [tier 2] • less than $250,000 [tier 1]."

C.  **Merrill Failed to Pay a Reasonable Rate of Interest on Plaintiff's RASP Accounts**

51.     At the time Plaintiff opened her Merrill Edge IRA market interest rates were essentially zero, and Plaintiff did not consider it unusual that her Merrill Edge account (tier 2) paid interest on her sweep balance of 0.01%.

52.     However, Plaintiff maintained an online savings account at Flagstar Bank and other brokerage accounts at Fidelity Investments, and through those accounts was able to monitor interest rates.

53.     Beginning in March 2022, when Fidelity and Flagstar started to raise the rates they paid on cash, Plaintiff continued to monitor her Merrill account expecting Merrill to raise its interest rate on tier 2 as well.  The federal funds target rate rose initially from 0.000 to 0.25% to 0.25 to 0.50% on March 17, 2022 and ended 2022 at 4.25% to 4.50%.  As of December 7, 2023, the federal funds target rate was 5.25% to 5.50% and the effective federal funds rate as published by the Federal Reserve Bank of New York rate was 5.33%.[11]

---

[11] https://perma.cc/6GFG-XPG4 (last viewed December 8, 2023).

54.     At a time when interest rates generally were increasing in conjunction with increases to the Federal Funds rate, Merrill kept RASP interest rates unreasonably low.  For example, RASP rates ended 2022 at 0.01% (tier 1), 0.01% (tier 2), 0.30% (tier 3), and 1.06% (tier 4), and did not rise at all in 2023.

55.     In March 2023, after Merrill failed to increase rates, Plaintiff transferred her Merrill IRA to Fidelity.

56.     The term "reasonable" is not defined explicitly in the CRA or IRA Agreements. Based on its "ordinary meaning" (using Webster's and Oxford dictionary definitions), "reasonable" is synonymous with "fair market value" and can be determined using a market approach of comparable instruments.

57.     A reasonable rate of interest is the rate that would result in a competitive market under fair market valuation conditions, *i.e.* a rate parties would agree to in an arm's length transaction where neither party was able to exert market power over the other.

58.     Fair market value is defined by the IRS as: "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts."

59.     The Organization for Economic Co-operation and Development ["OECD"] guidance for financial transactions states that "it is necessary to consider the conditions that independent parties would have agreed to in comparable circumstances. Independent enterprises, when considering whether to enter into a particular financial transaction, will consider all other options realistically available to them, and will only enter into the transaction if they see no

alternative that offers a clearly more attractive opportunity to meet their commercial objectives."[12]

60.     IRS regulations define an "arm's-length interest rate" for purposes of assessing transfer pricing between related entities as

> a rate of interest which was charged, or would have been charged, at the time the indebtedness arose, in independent transactions with or between unrelated parties under similar circumstances. All relevant factors shall be considered, including the principal amount and duration of the loan, the security involved, the credit standing of the borrower, and the interest rate prevailing at the situs of the lender or creditor for comparable loans between unrelated parties.  [26 CFR §1.482-2(a)(2)].

61.     Consistent with the common-sense, plain meaning of reasonableness, which means fair, a reasonable rate pursuant to IRC §4975 as mandated under Merrill's brokerage agreement, is one that takes into account other market rates for similar albeit not identical products in arm's-length transactions.

62.     The Department of Labor in 2003 had been requested to grant an exemption from the restrictions regarding "prohibited transactions" in ERISA § 408(a) and IRC § 4975(c)(2), with regard to deposits held at Deutsche Bank, A.G.

63.     The Department of Labor, which maintains enforcement authority with respect to the prohibited transaction rules in the IRC, provided in granting the exemption, a definition of "reasonable rate" that took into account a broad range of similar albeit not identical products to bank deposit accounts:

> A "reasonable" rate of interest means a rate of interest determinable by reference to short-term rates available to other customers of the bank, those offered by other banks, those available from money market funds, those applicable to short-term instruments such as repurchase agreements, or by reference to a benchmark such

---

[12] OECD Transfer Pricing Guidance on Financial Transactions: Inclusive Framework on BEPS: Actions 4, 8-10, 10.18 – 10.19. Available at https://perma.cc/TNY9-9GK2 (last viewed December 8, 2023).

as sovereign short term debt (*e.g.*, in the U.S., treasury bills), all in the jurisdiction where the rate is being evaluated.[13]

64.     Three-month treasury bills, an instrument the Department of Labor has advised should be considered in determining a reasonable interest rate (*supra* at ¶63), rose in yield from 0.046% as of January 1, 2022 to 5.378% as of November 3, 2023.

65.     Merrill is financially motivated to default its customers into its low-paying cash alternatives.  Merrill maintains in its Merrill Edge brokerage accounts hundreds of millions if not billions of dollars in cash.

66.     RASP rates are set unilaterally as default rates by BANA to maximize net income to BANA and by taking advantage of investors with insensitivity to rates.

67.     Because of the stickiness of accounts, swept deposits are a valuable deposit franchise for brokerage businesses.

68.     Sweep deposits are the aggregation of individual cash balances across a large number of accounts held by relatively rate insensitive customers, and together provide a stable source of funding for Merrill.

69.     Merrill and its affiliated companies (BAC and BANA), benefit in the hundreds of millions of dollars (if not more) from the NIM spread between the rate Merrill pays its Merrill Edge customers and the rate at which BANA can lend to borrowers or otherwise invest cash deposits.

70.     That sweep accounts are bundled with brokerage accounts make sweep customers less sensitive to interest rates paid on cash than depositors in separate banks. Customers with brokerage and affiliated sweep accounts hold only a fraction of their combined assets in cash so

---

[13] Prohibited Transaction Exemption 2003-11, §III(f), 68 Fed. Reg. 34,648 (June 10, 2003), available at https://perma.cc/Z7YJ-QDHM (last viewed December 8, 2023).

their choice of broker and affiliated sweep account will depend on the features and terms primarily of their brokerage accounts. Investors are more focused on the performance of equity and bond investments, and tend not to consider the performance of cash in their portfolio.

71.     The stickiness of sweep account holders may be greater than bank depositors, and makes them more susceptible to abuse through lower rates.

**1.  Brokers That Sweep to Unaffiliated Banks Pay (Presumptively) Reasonable Rates**

72.     The question of whether RASP rates are reasonable – is more appropriately assessed by comparison to rates on deposit accounts that are not affiliated with sweep programs, because the rates on affiliated sweep programs are not market-based, but rather are rates investors are defaulted into, and are subject to inherent conflicts of interest.

73.     It is the related party relationship between brokerage services and cash sweep products that leads to regulatory concern that deposit rates offered to customers in sweep accounts might not be reasonable, fair market rates.

74.     Merrill had a conflict of interest in connection with offering cash sweep options to customers because it benefitted from paying below market rates on deposits being held by its affiliated bank.

75.     This conflict of interest is widespread across the retail brokerage industry and gives rise to the prohibitions of affiliated brokerage sweep deposits under the IRC and ERISA. For this reason, the sweep rates paid by other affiliated banks and brokerage firms alone are not a valid benchmark for assessing the reasonableness of the rates paid.

76.     Merrill pursued a pricing strategy to maximize profits.  The sweep rates were set by BANA unilaterally in a manner that was inconsistent with the fair market value standard and so are not presumptively reasonable rates.

77.     The unreasonably low level of sweep rates offered to customers during the 2022-23 rate cycle is illustrated by comparison of rate differentials between customer account tiers and market benchmarks during previous increasing interest rate cycles (such as 2004-06, when Merrill's sweep rates closely tracked MMF rates).  *See Valelly,* ECF 209-7, ¶¶137, 141.

78.     Moreover, other brokerages that swept cash to unaffiliated banks set rates between brokerages and banks resulting from something that more closely resembles arm's-length negotiations.  For example, Fidelity Investments and R.W. Baird do not sweep cash to affiliated banks, and pay substantially higher rates of interest than Merrill and other brokerages that sweep cash to affiliated banks.  For example, at year-end 2022, Fidelity paid 2.21% and R.W. Baird paid between 1.69% (on cash balances up to $1 million) and 3% (on cash balances above $5 million).

79.     The federal funds target rate continued to increase in 2023 hitting an effective yield of 5.33% on August 23, 2023.  Similarly, Fidelity and R.W. Baird continued to increase the rates it paid on swept cash, which continues to the present.  Fidelity currently (as of December 1, 2023) pays 2.69% regardless of account balances and Baird pays between 2.07% (on cash balances up to $1 million) and 4.15% (on cash balances above $5 million).

80.     On August 7, 2019, Fidelity issued a press releases announcing that "it has challenged conventional industry practices by automatically directing investors' cash into higher yielding options available for brokerage and retirement accounts as well as providing product choice – all without any minimum requirements."[14]

---

[14] https://perma.cc/S6S6-HA2Y(last viewed December 8, 2023).

81.     Fidelity emphasized that Plaintiff's circumstances are representative of customers who choose to do business with broker-dealers such as Merrill, who refuse to be transparent as to the amount of interest they pay customers.  The Fidelity press release stated, "Recent customer research shows that many investors don't focus on the rate paid on their cash when they open an account and, too often, they don't take action later.  Fidelity has made it easy for customers by automatically giving them the higher yielding option at account opening, while also providing other investment options for those customers who prefer it."

82.     The press release added that Fidelity's approach in offering high yields on cash balances "is contrary to typical industry practices of defaulting customers' cash into a low-yielding product – often at an affiliated bank – with no other option in what the industry calls a 'cash sweep.'"

83.     However, banks such as Merrill, and other banks that swept cash to affiliated banks, who had a conflict of interest and profited from paying low rates, continued to pay low rates of interest on FDIC-insured sweep accounts.  Thus, for example, Merrill continued to pay 0.01% throughout 2023 on cash swept in tiers 1 and 2, and 0.30% throughout 2023 on cash swept in tier 3.  Tier 4 paid a high of 1.06% in 2023.

84.     The rates set by Fidelity and R.W. Baird at arm's-length are evidence of the fair market or reasonable rates based on business and economic conditions.  The rates set by Merrill, by default, in a self-interested transaction, are not reasonable rates.

**2.  Merrill Failed to Pay Reasonable Rates Even Compared to Other Sweep Accounts**

85.     Crane Data is a data source commonly used in the banking industry.

86.     Crane Data reported on its blogs that Merrill consistently paid the lowest interest rate of "major brokerages."  In its blog dated September 6, 2023[15], for example, Crane Data reported that

> Our Brokerage Sweep Intelligence Index, an average of FDIC-insured cash options from major brokerages, was unchanged at 0.62% after rising 1 bp three weeks prior. The latest Brokerage Sweep Intelligence, with data as of Sept 1, shows that there was no changes over the past week. Three of the 11 major brokerages tracked by our BSI still offer rates of 0.01% for balances of $100K (and lower tiers). These include: E*Trade, Merrill Lynch and Morgan Stanley. [16]

87.     *See also* blog dated August 29, 2023 (reporting the Brokerage Sweep Intelligence Index of average FDIC-insured cash sweep options at 0.62% whereas Merrill was paying 0.01% on swept cash); July 5, 2023 (reporting the Brokerage Sweep Intelligence Index of average FDIC-insured cash sweep options at 0.59% whereas Merrill was paying 0.01% on swept cash); blog dated May 2, 2023 (reporting Index at 0.56%, Merrill at 0.01%).[17]

88.     Merrill's expert in *Valelly* articulated a metric of the 25th percentile to determine whether Merrill's RASP sweep rates through 2022 were "comparable" to other Crane Data-published sweep rates, apparently as a proxy to determine if Merrill's rates are reasonable.  ECF 209-4.  But even by that metric, Merrill's rates were below the 25th percentile of rates tracked by Crane and thus even by Merrill's analysis are not "comparable" to other sweep rates or reasonable.

---

[15] September 6, 2023 blog at https://perma.cc/3Y9Y-RSCK (last viewed December 8, 2023).

[16] Because different brokers use a different base to determine tiers it is not always practicable to make a pure apples-to-apples comparison across all tiers.  For example, Merrill uses "statement-linked" balances, whereas Schwab uses "household balances" and other firms use cash balances.

[17] August 29, 2023 blog at https://perma.cc/QS49-MLYZ; July 5, 2023 blog at https://perma.cc/P3QB-9TT2; May 2, 2023 blog at https://perma.cc/EK85-K67V (last viewed December 8, 2023)

89.     Plaintiff disputes in any event that Crane Data is "the" authoritative source on sweep rates.  Peter Crane is obviously knowledgeable with respect to sweep rates.  However, Crane Data and Peter Crane are conflicted in that they are sponsored by or provide auditing services on sweep rates for participants in the industry, including Ameritrade and Bank of America, and because Crane Data does not purport to be scientific in its selection of brokerages in its Brokerage Sweep Intelligence Index.  *See, e.g.,* Crane Data March 29, 2023 blog post referring to Bank of America as the sponsor of an evening reception at Crane Data's June 2023 MF Symposium.[18]

90.     Since approximately 2016, the Brokerage Sweep Intelligence Index contained data on FDIC-insured sweep rates for the same eleven brokers, notwithstanding substantial changes in the industry.

91.     The Crane index excludes sweep programs offered by brokers such as Vanguard Investments.

92.     Barron's June 9, 2023 survey of "2023's Best Brokers" rated ten online brokerage companies offering comparable sweep products, consisting of five brokerages that were reported by Crane (Fidelity, Charles Schwab, E*Trade, TD Ameritrade, and Merrill Edge) and five brokerages that were not reported by Crane (Interactive Brokers, Robinhood, WeBull, Ally

---

[18] March 29, 2023 blog at https://perma.cc/KTL3-JDPD (last viewed December 8, 2023).

Invest, and JPMorgan Self-Directed Investing).[19]  Vanguard was referenced by Barron's as having "9.1 million self-directed investors as of May 2022."[20]

93.     Likewise, Vanguard was identified in the August 10, 2023 issue of U.S. News and World Reports, as the largest brokerage firm in the U.S., with $8.2 trillion dollars of assets under management.[21]

94.     Interactive Brokers, Robinhood, WeBull, and Vanguard each sweep cash to unaffiliated brokers and offer substantially higher rates than Merrill and the other unaffiliated banks: Interactive Brokers pays up to 4.83% on swept cash, Robinhood pays 1.5% as of August 11, 2022 or 4.9% for Robinhood Gold members as of July 27, 2023," WeBull pays 5% and Vanguard pays 3.7%.

95.     Peter Crane himself, in his August 2018, newsletter observed that "brokerage sweep rates" had "lagged dramatically" compared to other market rates and that bank deposit rates were "a ridiculously low 0.20%". August 2018 Crane's Report "Rising MF Yields Turn up Heat on Sweeps" at pp. 1-2, 5, and 7.

96.      Crane's August 2018 newsletter also profiled a Jason Zweig August 3, 2018 article in *The Wall Street Journal* ("Your Brokers Can Make 10 Times More on Your Cash Than You Do"), quoting Zweig as stating that "most major brokerages have shoved clients out of money-market funds and into lower yielding bank sweeps, thereby capturing much of the return

---

[19] *See* Barron's June 9, 2023 survey of "2023's Best Brokers" at https://www.barrons.com/articles/interactive-fidelity-schwab-best-online-brokers-ratings-52d73cb3 (last viewed December 8, 2023).

[20] *See* Barron's June 9, 2023 article "The Best Online Brokers of 2023" at https://www.barrons.com/articles/best-online-brokers-df3fe4af (last viewed December 8, 2023).

[21] https://money.usnews.com/investing/portfolio-management/articles/the-largest-brokerage-firms-this-year  (last viewed December 8, 2023) ("Overall, Vanguard is more focused on retirement investing than its largest rivals.").

on customers' cash for themselves…. If the Securities and Exchange Commission wants to make good on its promise to compel brokers to act in their customers' best interest, it should shine a klieg light on how brokers treat investors' cash."[22]

97.     Similarly, an August 7, 2019 Wealth Management article included a quote from Crane: "You've seen brutal competition in the brokerage market place," said Crane Data's Peter Crane. "Almost all of the others are sweeping to FDIC accounts with miserable yields." Fidelity Highlights Benefits of Default Cash Options for Retail Accounts.[23]

98.     BofA Securities, an affiliate of Merrill, publishes more comprehensive data on sweep rates than Crane Data.  According to a BofA Global Research report dated May 10, 2023, BofA Global Research has "designed a data scraper that automatically pulls the cash sweep rates from the websites of retail brokers daily."

99.     BofA Securities reports a larger cross-section of sweep rates than Crane Data. Among the sweep rates reported by BofA Securities for Tier 1, as of May 13, 2023, for example, which were not reported by Crane Data, included Robinhood (1.5% APY), Robinhood Gold (4% APY), LPL Financial Deposit Cash Account (0.30% APY), LPL Financial Insured Savings Account (0.35% APY), and Vanguard (3.00% APY).

100.     Each of these rates reported by BofA Securities are far higher than the tier 1 rates paid by Merrill on RASP (0.01%) and generally higher than the rates on the eleven brokerages reported by Crane Data (especially with respect to Robinhood and Vanguard).

---

[22] https://perma.cc/75NQ-6C8P (last viewed December 8, 2023).

[23] https://perma.cc/B82W-QM3K (last viewed December 8, 2023).

101.    Fidelity Investment's FDIC-insured sweep rate, reported both by Crane Data and by BofA Securities, and R.W. Baird's sweep rates reported by Crane Data, have been at all times since March 2022 substantially higher than the rates paid by Merrill.

102.    The same holds true with respect to a comparison of Merrill's rates to the rates paid by the brokerages surveyed by BofA Securities – that the sweep rates paid by Merrill were unreasonable compared to the rates surveyed by BofA securities.

### 3.  Rates Paid By Online Banks Are Presumptively Reasonable Rates

103.    A money market deposit account can be sponsored by a "brick and mortar" bank or an online bank.

104.    An online bank generally provides fewer services than a "brick and mortar" bank, and does not have to employ tellers or pay rent for a physical bank location.

105.    Online banks generally pay a higher rate of interest than a brick and mortar bank.

106.    In April 2018, Marcus by Goldman Sachs, a prominent online bank, issued a press release stating that

> a whopping 60% of consumers with savings accounts don't know their account APY (annual percentage yield) and more than half (52%) do not know how much money they earned in interest from their savings accounts last year.

107.    The press release also stated, consistent with the statistics set forth below, that "This month, Marcus released a new campaign that sheds light on how traditional savings accounts offer such low interest rates, and that the banks are essentially just storing consumers' money.  Unlike those accounts, Marcus offers our Online Savings Account with a 1.60% APY rate that is 4X the National Average."

108.    A separate Fidelity study is referenced *supra* at ¶¶80-82.

109.    The RASP money market deposit account that Merrill employed as the sweep alternative was an online money market product.

110.    With both the RASP account and an "online" money market deposit account, funds are transferred electronically from a depositor to the bank, without the need for a "brick and mortar" bank.  For example, RASP does not come with a checking account or debit card or other traditional banking services.  Cash in investment accounts is automatically transferred to BANA without the involvement of bank tellers.

111.    Merrill Edge promotes itself as an "online brokerage account":

An online brokerage account allows you to easily transfer available funds between your Bank of America bank and Merrill investment accounts and gives you access to a full range of investment choices.[24]

112.    Merrill's Electronic Communications Disclosure statement, which Plaintiff was required to consent to, provided that Merrill's written communications with Plaintiff would be predominantly, if not exclusively, online.[25]

113.    The January 2023 CRA, among other documents, emphasizes (at p. 2, ¶2) that Merrill does not provide any investment advice with respect to Merrill Edge Self-Directed Accounts.  *See also* ¶14, *supra*.

114.    Because BANA provided Plaintiff with no or only limited services in exchange for the use of her cash, BANA had the ability to pay Plaintiff the higher rate of interest, akin to an online bank.

---

[24] https://perma.cc/2BAV-NU5K (last viewed December 8, 2023).

[25] https://perma.cc/58P6-MF58 (last viewed December 8, 2023).

115.    In evaluating a "reasonable rate" of interest on a money market deposit account, accordingly, an appropriate comparison is to the FDIC-insured rate paid on a money market deposit account by an online bank.

116.    Informa Research Services through a subsidiary (Curinos) specializes in compiling business data.

117.    Among its operations is compiling data on interest rates paid by U.S. banks on various deposit accounts, including money market deposit accounts.

118.    Informa publishes this data on a monthly basis over a running ten-year period.

119.    Informa publishes rates for prominent online banks, the 50 largest FDIC-insured banks in the U.S. by deposit accounts, and all FDIC-insured banks in the U.S.  The online rates particularly, unlike the rates paid by Merrill on RASP, tend to correlate with the FF rate.

120.    The interest rates offered by online banks better represent the competitive interest rate environment because brick and mortar banks tend to be less responsive to market rates.

121.    The following is a summary of the data made available by Informa for the period January 2022 through November 2023 for deposits in excess of $50,000 for all national banks, the top 50 national banks, and 74 prominent online banks:

| Date | All Natl Avg APY | Top 50 Avg APY | Internet Avg APY | Fed Rate |
|---|---|---|---|---|
| 7-Jan-22 | 0.10 | 0.08 | 0.24 | 0.08 |
| 4-Feb-22 | 0.10 | 0.08 | 0.25 | 0.08 |
| 4-Mar-22 | 0.10 | 0.08 | 0.26 | 0.08 |
| 1-Apr-22 | 0.10 | 0.08 | 0.26 | 0.33 |
| 6-May-22 | 0.10 | 0.09 | 0.28 | 0.83 |
| 3-Jun-22 | 0.11 | 0.10 | 0.34 | 0.83 |
| 1-Jul-22 | 0.13 | 0.15 | 0.45 | 1.58 |
| 5-Aug-22 | 0.16 | 0.22 | 0.62 | 2.33 |

| | | | |
|---|---|---|---|
| 2-Sep-22 | 0.19 | 0.26 | 0.72 | 2.33 |
| 7-Oct-22 | 0.27 | 0.38 | 0.89 | 3.08 |
| 4-Nov-22 | 0.31 | 0.44 | 1.06 | 3.83 |
| 2-Dec-22 | 0.40 | 0.59 | 1.26 | 3.83 |
| 6-Jan-23 | 0.49 | 0.73 | 1.43 | 4.33 |
| 3-Feb-23 | 0.52 | 0.78 | 1.55 | 4.58 |
| 3-Mar-23 | 0.56 | 0.78 | 1.61 | 4.57 |
| 7-Apr-23 | 0.61 | 0.83 | 1.68 | 4.83 |
| 5-May-23 | 0.65 | 0.86 | 1.72 | 5.08 |
| 2-Jun-23 | 0.69 | 0.93 | 1.79 | 5.08 |
| 7-Jul-23 | 0.71 | 0.95 | 1.83 | 5.08 |
| 4-Aug-23 | 0.74 | 0.99 | 1.88 | 5.33 |
| 01-Sep-23 | 0.74 | 1.00 | 1.92 | 5.33 |
| 06-Oct-23 | 0.76 | 1.01 | 1.99 | 5.33 |
| 03-Nov-23 | 0.78 | 1.04 | 1.95 | 5.33 |

122.    The following is a summary of the data made available by Informa for the period

January 2022 through November 2023 for the average rate on deposits in excess of $10,000 for

the same group of banks:

| Date | All Natl Avg APY | Top 50 Avg APY | Internet Avg APY | Fed Rate |
|---|---|---|---|---|
| 7-Jan-22 | 0.07 | 0.07 | 0.22 | 0.08 |
| 4-Feb-22 | 0.07 | 0.07 | 0.22 | 0.08 |
| 4-Mar-22 | 0.07 | 0.07 | 0.23 | 0.08 |
| 1-Apr-22 | 0.07 | 0.08 | 0.24 | 0.33 |
| 6-May-22 | 0.08 | 0.08 | 0.26 | 0.83 |
| 3-Jun-22 | 0.08 | 0.10 | 0.32 | 0.83 |
| 1-Jul-22 | 0.10 | 0.15 | 0.41 | 1.58 |
| 5-Aug-22 | 0.12 | 0.21 | 0.56 | 2.33 |

| | | | | |
|---|---|---|---|---|
| 2-Sep-22 | 0.14 | 0.25 | 0.66 | 2.33 |
| 7-Oct-22 | 0.20 | 0.35 | 0.77 | 3.08 |
| 4-Nov-22 | 0.24 | 0.41 | 0.94 | 3.83 |
| 2-Dec-22 | 0.31 | 0.53 | 1.07 | 3.83 |
| 6-Jan-23 | 0.37 | 0.61 | 1.21 | 4.33 |
| 3-Feb-23 | 0.39 | 0.66 | 1.27 | 4.58 |
| 3-Mar-23 | 0.43 | 0.67 | 1.35 | 4.57 |
| 7-Apr-23 | 0.46 | 0.72 | 1.40 | 4.83 |
| 5-May-23 | 0.49 | 0.74 | 1.43 | 5.08 |
| 2-Jun-23 | 0.51 | 0.78 | 1.49 | 5.08 |
| 7-Jul-23 | 0.53 | 0.80 | 1.52 | 5.08 |
| 4-Aug-23 | 0.55 | 0.85 | 1.56 | 5.33 |
| 01-Sep-23 | 0.56 | 0.86 | 1.59 | 5.33 |
| 06-Oct-23 | 0.58 | 0.91 | 1.60 | 5.33 |
| 03-Nov-23 | 0.59 | 0.92 | 1.59 | 5.33 |

123.    The following is a list of the prominent online banks whose interest rates Informa currently tracks:

Able Bank - US
Affirm - US
Ally Bank - US
AloStar Bank of Commerce - US
Amboy Direct - US
American Express Bank - US
Ameriprise Bank - US
Apple - US
Axos Bank - US
BankPurely - US
BankUnitedDirect - US
Barclays Bank - US
Bask Bank - US

Betterment - US - US
BMO Alto - US
Bread Savings - US
BrioDirect - US - US
Capital One 360 - US
Charles Schwab Bank - US
Chime - US - US
CIBC USA - US
CIT Bank - US
Citibank - National - US
Citizens Access - US
Colorado Federal Savings Bank - US
Credit Karma - US
Customers Bank - Internet - US
Discover Bank - US
Discovery Benefit - US
Dollar Savings Direct - US
E-Trade Bank - National - US
EmigrantDirect - US
EverBank - US
First Internet Bank - US
First National Bank of Omaha - National - US
First National Bank of Omaha Direct - US
Giantbank.com - US
GiftsforBanking.com - US
HSBC Bank - US
Huntington National Bank - Online (Region)
iGobanking.com - US
IncredibleBank - US
LendingClub Bank - US
Marcus by Goldman Sachs - US
MidFirst Bank - Direct - US
My eBanc - US
My Savings Direct - US
MyBankingDirect.com - IL
MyBankingDirect.com - US
MYSB Direct - US
Newtek Bank - US
Northern Bank Direct - US
Northwest Bank - Online - Region 13 - US
OneUnited Bank - US
OneWest Bank - US
PayFlex - US

PNC Bank - National - US
Popular Direct - US
Presidential Bank - US
Principal Bank - US
PurePoint Financial - US
Raymond James Bank - US
Salem Five Direct - IL
Salem Five Direct - US
Sallie Mae - US
Synchrony Bank - US
T-Mobile Money - US
U.S. Bank - 24 Hour Banking & Financial Se...
UFB Direct - US
UMB Bank - Region 7 - US
Valley Direct Bank - US
Vio Bank - US
VirtualBank, a division of First Horizon - US
Zions Bank - Online - US

124.    Plaintiff's counsel has been informed by Informa that this list is substantially similar to the list of online banks that Informa tracked from January 2022 through July 2023.

125.    Interest rates for online money market deposit accounts during the period March 2022 through the present are substantially higher than the Merrill rates paid to Plaintiff and other Class Members.  And unlike the rates paid by Merrill on RASP, the rates paid by online banks reflected changes in the federal funds rate, reflecting the higher value of cash to banks.

126.    Merrill's expert in *Valelly* argued that there are different attributes of sweep accounts from online accounts, but failed to explain why those differences justified the wide variation between rates paid on RASP and rates paid by online banks.  *See* ECF 209-4.  Nor did Merrill's expert consider that other online brokers such as Fidelity, Baird, and Robinhood pay sweep rates comparable to or in excess of online banks.

127.    Merrill's RASP rates were not reasonable compared to the rates paid by other online banks.

### 4. Merrill's Insured Savings and Preferred Deposit Accounts Pay Presumptively Reasonable Rates

128.    Merrill offers competitive rates to investors on other products that are not sweep rates.  For example, Merrill offers a Preferred Deposit product for non-retirement investors who make an initial cash deposit of $100,000 or more.  Preferred Deposit paid competitive rates -- a high of 3.98% in 2022, and a high of 5.02% in 2023.

129.    Preferred Deposit however is a "ticketed" item in that cash is not immediately available to trade.

130.    The fair market standard requires that benchmark rates be set in transactions free from compulsion *i.e.* such that cash deposit rates would be selected freely by customers without restrictions on available competitive options. The ability of Merrill to create barriers to accessing competitive rates represents a form of compulsion to accept default sweep rates on uninvested cash balances.  For this reason, Preferred Deposit rates may be a fair market benchmark for cash balances exceeding $100,000.

131.    Similarly, Merrill offers an Insured Savings Account ("ISA") for non-Merrill Edge investors who made an initial cash deposit of $1,000 or more.  The ISA paid a high of 2.31% in 2022, and a high of 3.54% in 2023. ISA is, as well, a ticketed item.

132.    With regard to the ISA and Preferred Deposit, investors were not required to maintain that minimum deposit in their account ($1,000 or $100,000, respectively), so long as it was their opening deposit.

133.    Like the RASP, the ISA and Preferred Deposit account are FDIC insured.

134.    According to Merrill's Sweep Program Guide (at 3), Merrill does make the ISA available as a sweep option to certain customers in Retirement Cash Management Accounts.

135.     Unlike each of Merrill's other sweep programs, according to the Sweep Program Guide, the ISA sweeps to both affiliated and unaffiliated banks, although to Plaintiff's knowledge the mix between the two is not publicly disclosed.

136.     As with the ISA, when Merrill sweeps to unaffiliated banks, it lacks the same conflict of interest and profit motive to pay as low a sweep rate as possible, and therefore is motivated to negotiate on behalf of its investors a higher rate of interest.  Merrill did not make either Preferred Deposit or the Insured Savings Account available to Merrill Edge retirement investors.[26]

137.     Thus, unlike RASP, ISA pays a presumptively reasonable rate of interest.

138.     Merrill restricted this option to investors on a "ticketed" basis, which imposed manual enrollment hurdles designed to suppress participation.

139.     When faced with motivated investors, Merrill paid equivalent, market rates. The rates that Merrill was willing to pay on Preferred Deposit and ISA is evidence of a reasonable rate of interest.  That Merrill restricted access to competitive rates, and defaulted investors into low-yielding sweep accounts, cannot be used to argue that the lower rates it paid its sweep customers by default were consistent with the fair market value standard.

140.     The gross disparity between Preferred Deposit and the ISA (on the one hand) and RASP (on the other hand) demonstrates that RASP rates are unreasonable.

141.     Below is a chart reflecting (from January 2022 through November 2023) the rates paid by Merrill on RASP (tiers 1-3), the rates paid by BANA on ISA and Preferred Deposit, the average rate paid by online banks (per Informa), the FDIC-insured rates paid by Fidelity, the rate

---

[26] According to Merrill's Sweep Program Guide (p. 3, fn.), ISA is not available at all to Merrill Edge customers.

paid on SPAXX, and the effective FF rate.  The graph shows a clear correlation between the FF

rate and other market rates, with the exception of Merrill's RASP rates:

| Month-ended | Merrill Tier One | Merrill Tier Two | Merrill Tier Three | Insured Savings Account (ISA) | Preferred Deposit | Informa Data (Internet Avg) ($10K+) | Informa Data (Internet Avg) ($50K+) | Fidelity FDIC Insured Rate | Fidelity SPAXX | FF Rate |
|---|---|---|---|---|---|---|---|---|---|---|
| Jan-22 | 0.01 | 0.01 | 0.01 | 0.01 | 0.05 | 0.22 | 0.24 | 0.01 | 0.01 | 0.08 |
| Feb-22 | 0.01 | 0.01 | 0.01 | 0.01 | 0.05 | 0.22 | 0.25 | 0.01 | 0.01 | 0.08 |
| Mar-22 | 0.01 | 0.01 | 0.01 | 0.01 | 0.05 | 0.23 | 0.26 | 0.01 | 0.01 | 0.33 |
| Apr-22 | 0.01 | 0.01 | 0.01 | 0.01 | 0.05 | 0.24 | 0.26 | 0.01 | 0.01 | 0.33 |
| May-22 | 0.01 | 0.01 | 0.01 | 0.01 | 0.4 | 0.26 | 0.28 | 0.25 | 0.38 | 0.83 |
| Jun-22 | 0.01 | 0.01 | 0.01 | 0.01 | 1.16 | 0.32 | 0.34 | 0.25 | 0.99 | 1.58 |
| Jul-22 | 0.01 | 0.01 | 0.01 | 0.35 | 1.16 | 0.41 | 0.45 | 0.69 | 1.28 | 2.32 |
| Aug-22 | 0.01 | 0.01 | 0.04 | 0.53 | 1.92 | 0.56 | 0.62 | 1.19 | 1.8 | 2.33 |
| Sep-22 | 0.01 | 0.01 | 0.05 | 1.17 | 2.69 | 0.66 | 0.72 | 1.57 | 2.49 | 3.08 |
| Oct-22 | 0.01 | 0.01 | 0.05 | 1.24 | 2.69 | 0.77 | 0.89 | 1.57 | 2.65 | 3.08 |
| Nov-22 | 0.01 | 0.01 | 0.23 | 1.24 | 3.46 | 0.94 | 1.06 | 1.57 | 3.33 | 3.83 |
| Dec-22 | 0.01 | 0.01 | 0.30 | 2.31 | 3.98 | 1.07 | 1.26 | 2.21 | 3.84 | 4.33 |
| Jan-23 | 0.01 | 0.01 | 0.30 | 2.51 | 3.98 | 1.21 | 1.43 | 2.21 | 3.96 | 4.33 |
| Feb-23 | 0.01 | 0.01 | 0.30 | 2.77 | 4.24 | 1.27 | 1.55 | 2.34 | 4.22 | 4.57 |
| Mar-23 | 0.01 | 0.01 | 0.30 | 2.77 | 4.50 | 1.35 | 1.61 | 2.47 | 4.48 | 4.83 |
| Apr-23 | 0.01 | 0.01 | 0.30 | 3.02 | 4.50 | 1.40 | 1.68 | 2.47 | 4.50 | 4.83 |
| May-23 | 0.01 | 0.01 | 0.30 | 3.02 | 4.76 | 1.43 | 1.72 | 2.60 | 4.75 | 5.08 |
| Jun-23 | 0.01 | 0.01 | 0.30 | N/A | N/A | 1.49 | 1.79 | 2.60 | 4.75 | 5.08 |
| Jul-23 | 0.01 | 0.01 | 0.30 | 3.28 | 4.76 | 1.52 | 1.83 | 2.60 | 4.91 | 5.33 |
| Aug-23 | 0.01 | 0.01 | 0.30 | N/A | N/A | 1.56 | 1.88 | 2.72 | 4.98 | 5.33 |
| Sep-23 | 0.01 | 0.01 | 0.30 | N/A | N/A | 1.59 | 1.92 | 2.72 | 4.99 | 5.33 |
| Oct-23 | 0.01 | 0.01 | 0.30 | 3.54 | 5.02 | 1.60 | 1.99 | 2.72 | 4.99 | 5.33 |
| Nov-23 | 0.01 | 0.01 | 0.30 | 3.54 | 5.02 | 1.59 | 1.95 | 2.72 | 5.00 | 5.33 |

FF Rate: https://www.newyorkfed.org/markets/reference-rates/effr

N/A: Not available.

### 5.  BANA Pays Reasonable Interest Rates on the 529 Plan Administered for Maine

142.    Merrill is the recordkeeping agent of the Maine (NextGen) 529 plan.

143.    529 plans are named after Section 529 of the Internal Revenue Code and are

administered on a state-specific basis.  529 plans are intended to facilitate savings for college.

144.    Merrill negotiates at arm's-length with the State of Maine to be the record-keeping agent on the 529 plan.

145.    Accordingly, Merrill and its affiliate (BANA) are required to pay participants reasonable, market rates of interest on cash maintained in 529 plans.

146.    According to information on the Maine 529 website, among the investment alternatives available to participants is the NextGen Savings Portfolio.  The notes on the NextGen website state (at fn. 1) – "The return of the NextGen Savings Portfolio is based on the interest rate paid by Bank of America, N.A. (the 'Bank') on the deposits of the NextGen Savings Portfolio, which will vary over time at the Bank's discretion without notice."[27]

147.    The NextGen Savings Portfolio is comparable to RASP in that it is a vehicle for investment of cash when that cash is not being used for other investment options.

148.    Yet, unlike RASP, BANA pays a presumptively reasonable rate of interest. According to the NextGen website (*id.*), the BANA NextGen Savings Portfolio paid an average annual total return of 3.84% for the one year period ended June 30, 2023 – substantially above the rate paid on RASP.

**6.    Rates Paid By MMF Sweep Accounts Are Presumptively Reasonable Rates**

149.    SEC Rule 2a-7 "is the principal rule governing money market funds."[28] According to Rule 2a-7(a)(14), government MMFs are required to invest at least 99.5% of their total assets in cash, U.S. Treasury securities, or fully collateralized repurchase agreements (repos).  Moreover, MMFs are required to invest in short-term investments, which are defined as

---

[27] https://perma.cc/Z4DE-DPJZ (last viewed December 8,2023).

[28] *See* https://www.sec.gov/files/rules/proposed/2021/ic-34441-fact-sheet.pdf (last viewed December 8, 2023).)

securities with maturities no greater than 397 days.  The SEC rule rules further require the dollar-weighted average maturity of the securities owned by a MMF to not exceed 60 days.[29]

150.    Treasuries are backed by the full faith and credit of the U.S. government.  Accordingly, Treasuries are risk-free investments that carry essentially no credit risk.  Moreover, portfolios with average maturities of 90-days or less are short-term and so subject to a negligible amount of interest rate risk. Because government MMFs invest solely in short-term government securities or cash, government money market funds are essentially risk-free and have never lost money.[30]  For these reasons, government MMFs have the same or better risk profile as FDIC-insured accounts with assets under the insurable limits set by the FDIC.[31]

151.    A money market mutual fund is "income producing, low risk, and liquid," and an appropriate capital preservation alternative for use in retirement accounts.  *See* 29 CFR § 2550.404c-1(b)(2)(ii)(C)(2)(ii).

---

[29] *See* 17 CFR § 270.2a-7(c)(2).

[30] Only three money market funds have ever lost money – or broken the buck – the First Multifund for Daily Income fund in 1978, the Community Bankers US Government Fund in 1994, and the Reserve Primary Fund in 2008.  However, none of these funds were Government MMFs.  All three of these funds invested heavily in non-government securities including commercial paper, or instruments with longer durations than what are allowed in a government money market fund.  *See e.g.,* Wiggins, Rosalind Z., and Andrew Metrick. "The Federal Reserve's Financial Crisis Response D: Commercial Paper Market Facilities." *The Journal of Financial Crises 2*, no. 2 (2020): 116-143.

[31] As further evidence, see the article by SEC staff, "Money Market Funds in the Treasury Market" (Baklanova, Kuznits, and Tatum, September 1, 2022) showing that "assets in government MMFs more than doubled in 2016 following implementation of the 2014 MMF reforms and increased considerably once again in the first half of 2020, when demand for government assets surged amidst the COVID-19 pandemic (Table 1)."  This suggests that government MMFs, like bank deposits, have generally low default risk.  Accessible at https://www.sec.gov/files/mmfs-treasury-market-090122.pdf (last viewed December 8, 2023).

152.    While stating that they are different products, the District Court in *Valelly* has acknowledged that FDIC-insured accounts and government MMFs have "a similar risk profile from the perspective of the customer."[32]

153.    Academic literature further supports the equivalence of MMFs and FDIC-insured accounts. For example, Federal Reserve economists Afonso *et al.* (2023) state that MMFs and bank deposits are "close substitutes from an investor's perspective."[33]

154.    Brokerages that sweep cash to money market mutual funds pay substantially higher rates of interest than Merrill and other brokerages that sweep cash to affiliated banks.  For example, in 2022-23 Fidelity Investments swept cash into its Fidelity Government Money Market Fund (SPAXX) and Vanguard Investments swept investors cash into its Vanguard Federal Money Market Fund (VMFXX).  Both government money markets consist of at least 99.5% U.S. government or agency securities backed by the full faith and credit of the U.S. government.  Both Fidelity and Vanguard government money market funds have minimal risk that is equivalent to FDIC-insured accounts.[34]  *See* 17 C.F.R. 270.2a-7(a)(11) discussed *infra*.

155.    In fact, because banks are free to invest in long-term securities that can substantially decline in value during periods of rising interest rates, bank deposit accounts are substantially more risky than government MMFs, which are required to invest in short-term assets.  *See* Letter dated June 2, 2023 from Federated Hermes to the SEC at pp. 1 and 4.[35]

---

[32] ECF 149 at 15, fn. 19.

[33] Afonso, Cipriani, and La Spada. "Banks' Balance-Sheet Costs, Monetary Policy, and the ON RRP." *FRB of New York Staff Report* 1041 (2022).

[34] Plaintiff recognizes that the Court in *Valelly* has held that government money market funds are not an appropriate comparator to FDIC-insured accounts (*e.g.*, ECF 182), but make these allegations (¶¶149-195), at a minimum, to preserve the issue for appeal.

[35] https://www.sec.gov/comments/s7-22-21/s72221-198539-397002.pdf (last viewed December 8, 2023).

156.    A money market deposit account ("MMDA") is a high-yield savings account that allows depository financial institutions to be competitive with money market mutual funds.

157.    There is no reason in fact why interest rates paid on MMDAs should not be considered competitive with interest rates paid on MMFs since banks are allowed (but not required to) invest in the same instruments as government MMFs.

158.    Rather, banks have more options to invest FDIC–insured sweep funds than issuers of government MMFs, which are required to invest in short-term government securities.

159.    Merrill acknowledges on its website in its document entitled Sweep Program Guide, that FDIC-insured deposit accounts and MMFs can be used interchangeably as sweep options.[36]

160.    Specifically, the Sweep Program Guide states on p. 2 that "You can choose to have the cash automatically 'swept' to a bank deposit program, or, for a limited number of account types, you may be able to choose a money market mutual fund."

161.    Thus, in limited circumstances, Merrill allows investors to use a MMF as a sweep option in its Retirement Cash Management Accounts.

162.    The MMFs that Merrill uses as the sweep option for the RCMAs are the BlackRock Liquidity Funds: Fed Fund – Cash Reserve Class and the BlackRock Liquidity Funds: Treasury Trust --- Cash Reserve Class.  Those funds yield, respectively 4.86% and 4.87% APY as of December 1, 2023 – substantially higher than the yields paid by Merrill on its FDIC-insured sweep accounts.

163.    Government regulations also demonstrate that MMDAs are competitive with government MMFs.

---

[36] https://perma.cc/SP3V-EPQV (last viewed December 8, 2023).

164.    Until the early 1980s, the federal government placed a limit on the amount of interest that banks and credit unions could offer customers on their savings accounts.

165.    Inflation in the United States spiked significantly in the mid-1970s, and after the Federal Reserve aggressively began raising rates in the 1980s in hopes of reversing the trend, investors flocked to mutual fund money markets to obtain higher interest rates.

166.    Under pressure from the banking industry, Congress passed the Garn-St. Germain Depository Institutions Act in 1982, which allowed banks and credit unions to offer money market accounts that paid a "money market" rate, which was higher than the previous capped rate.  *See* https://www.investopedia.com/terms/m/moneymarketaccount.asp (last viewed July 3, 2020).

167.    The Garn-St. Germain Depository Institutions Act removed the interest rate ceiling for banks and thrifts.

168.    Specifically, Section 327 of the Garn-St. Germain Act amended Section 204 of the Depository Institutions Deregulation Act of 1980 (12 U.S.C. §3503) by adding at the end thereof the following: "(c)(1) The [Depository Institutions Deregulatory] Committee ["DIDC"] shall issue a regulation authorizing a new deposit account, effective not later than 60 days after the date of enactment of this subsection.  Such account shall be directly equivalent to and competitive with money market mutual funds registered with the Securities and Exchange Commission under the Investment Company Act of 1940. (2) No limitation on the maximum rate or rates of interest payable on deposit accounts shall apply to the account authorized by this subsection."

169.    On October 15, 1982, the DIDC proposed regulations (47 Fed. Reg. 46530), "to authorize a new insured deposit account, available to all depositors, to compete with money market mutual funds."

170.    As stated in the summary to those proposed regulations, The Garn-St. Germain Act required that this deposit account:

> (1) Have no limitation on the maximum rate of interest payable; … and (4) be *directly equivalent to and competitive with money market mutual funds* registered with the Securities and Exchange Commission under the Investment Company Act of 1940.

(Emphasis added).

171.    Later in the proposed regulations, the DIDC stated: "Consistent with the Committee's statutory mandate to eliminate deposit interest rate ceilings, this proposal would enable all depository institutions to compete more effectively in the marketplace for short-term funds.   Depositors generally should benefit from the Committee's proposal, since the new instrument would provide them with another investment alternative that pays a market rate of return."

172.    On December 14, 1982, the DIDC promulgated final rules for MMDAs (47 Fed. Reg. 53710), codified at 12 C.F.R. §1204.122, effective December 14, 1982 (Money Market Deposit Account), providing for the unrestricted payment of interest "at any rate."

173.    The DIDC gave consideration to but rejected arguments that providing FDIC insurance on money market deposit accounts without restricting rates placed money market mutual funds at a competitive disadvantage.  *See* 47 Fed. Reg. 53710 at 53711, 13.  Merrill itself offered two money market funds as options for non-retirement sweep accounts prior to 2018.[37]

---

[37] Merrill Lynch, Notification of Changed Regarding BlackRock Money Market Funds as Sweep Options, accessed at https://perma.cc/Z64A-9QE8 (last viewed December 8, 2023).

174.     In a *Wall Street Journal* article dated August 21, 2018, Jason Zweig wrote that

"Starting Sept. 4, [BAC]'s Merrill Lynch brokerage unit will no longer sweep its customers' cash

into money-market mutual funds, moving it instead into deposits at affiliated banks."  Zweig

wrote that according to publicly available data at that time, the "yield on 100 large money-

market funds average 1.77%....  Bank sweep accounts at brokerage firms tend to pay about

0.25% on average."  Zweig also noted that paying low interest rates on sweep accounts is a big

business, and that brokerage firms like Merrill have "indicated that as much as 25% of their

gross profit came from what they earned off their customers' cash."[38]

175.     Commentators on the public website "advisorhub" were unyielding in their

criticism of Merrill Lynch for dropping the money market fund sweep option:[39]

> Merrill advisors are not going to appreciate being forced to push their clients'
> cash accounts into lower yielding BofA ones. You know who are going to
> appreciate it even less? The clients. ML advisors, don't be sheeple!
>
> *        *        *
>
> The irony of preaching the fiduciary standard while at the same time mandating
> bank products that pay the client less than they deserve…
>
> *        *        *
>
> The most profitable product for Bank of America is bank deposits. They pay the
> advisors peanuts for deposits, pay their customers less interest and make a ton of
> money while holding those deposits. The clients and customers interests are not
> being put first. It's a great place to get started but once you have a client base, get
> the F out!
>
> *        *        *
>
> Today's ML rates are .33% for under a million and .13% for under $250k.
> Vanguard paying 2.07%. Many others approaching 2.0% or are north of it.

---

[38] https://www.wsj.com/articles/merrill-lynch-joins-brigade-downplaying-money-market-mutual-funds-1534880179 (last viewed December 8, 2023).

[39] https://perma.cc/2T9R-KM8T (last viewed December 8, 2019).

Outside money markets not an option for clients. No open architecture at all. A fiduciary doesn't pay .13% while raising rates on loans and [loan management accounts].

*    *    *

Bank of America's motto: The client must come first right after Bank of America. A culture of dishonesty.

176.    The June 2017 CRA expressly allowed investors to execute trades against ticketed money market funds ("MMFs") without first selling those funds so that investments in MMFs would be immediately available to execute trades, *i.e.* cash equivalent.[40]  Those references however were omitted from the later June 2019 CRA so that investors would first have to liquidate their MMFs to have cash available to trade.[41]  By making investments in MMFs ticketed items that were more difficult for investors to trade, Merrill and BANA increased their profits by requiring that investors, who wanted immediate access to their cash, maintain that cash in low interest FDIC-insured deposit accounts.

177.    There is no reason why Merrill could not agree to execute a trade against cash in a secondary sweep account such as the Insured Savings Account, Preferred Deposit, or a money market fund. Merrill cannot create an impediment against executing trades and then cite to that impediment as a grounds for paying "unreasonable" rates of interest.

178.    The NYSE Information Memorandum ("IM") 05-11 addressing "Customer Account Sweeps to Banks," states under an all caps bolded heading "**CONFLICTS OF INTEREST**" that a money market fund is a superior alternative for a sweep account to an FDIC-Insured deposit account:

---

[40] *See* ECF 18-1, Section 13, pages 4-5.

[41] *See* MLPFS_0003490 (Code 422000PM-0619), Section 13.

A change from a money market mutual fund to a bank sweep fund may be inconsistent with the customer's reasonable expectations with regard to money market rates. While a registered investment company, such as a money market mutual fund, is bound by fiduciary obligations to its shareholders (customers of the member organization) to seek the highest rates prudently available (less disclosed fees and expenses), when customer funds are swept to an affiliated bank it is in the interest of the member organization and its affiliates to pay as low a rate as possible, consistent with their views of competitive necessities. There may be no necessary linkage with rates prevailing in the market, and these funds are not being managed, in this instance, under the same fiduciary obligations.

179.    The SEC's Investor Bulletin:  Bank Sweep Programs, dated June 5, 2014,

explicitly refers to money market mutual funds as acceptable sweep options:

One option, a bank sweep program, typically involves the automatic transfer (or "sweep") of cash in the brokerage account into a deposit account at a bank that may or may not be affiliated with the broker-dealer.  Other options include leaving cash in the brokerage account, or sweeping cash to one or more money market mutual funds.[42]

180.    As noted above, SEC regulations define a sweep program as consisting of either a

MMF or an FDIC-insured savings account.  *See* 17 CFR 240.15c3-3(a)(17).

181.    A 2016 bulletin from the OCC urged banks to use government MMFs as sweep

options:

Banks that offer sweep arrangements between deposit accounts and MMFs should assess the respective processing characteristics, system requirements, compliance requirements, and liquidity characteristics of government, retail, and prime MMFs. Based on operational and liquidity considerations, most banks will likely conclude that once the SEC's MMF reforms are fully implemented, government funds are the only practical option for bank deposit to MMF sweep arrangements.[43]

---

[42] https://www.sec.gov/oiea/investor-alerts-bulletins/ib_banksweep (last viewed December 8, 2023)

[43] Office of the Comptroller of the Currency, "OCC Bulletin 2016-17: Money Market Funds: Compliance with SEC Money Market Fund Rules by Bank Fiduciaries, Deposit Sweep Arrangements, and Bank Investments," May 19, 2016, accessed at https://perma.cc/W9Z7-UXXY (last viewed December 8, 2023).

182.     Many of Merrill's competitors, including Fidelity Investments and Vanguard investments, use MMFs as their primary sweep option.[44] For example, the Fidelity Government Money Market Mutual Fund (SPAXX), which Fidelity employs as a primary sweep account, has a fundamental investment objective to "seek[ ] as high a level of current income as is consistent with preservation of capital and liquidity."[45]  The Fidelity MMF is managed by an investment advisor, and is supervised by a Board of Trustees, each with an obligation to ensure that the fund is operated in a manner intended to achieve its fundamental investment objective.

183.     A list of MMFs that were offered as sweep options by brokers that compete with Merrill are listed in Table 1: Money Market Funds With Automatic Sweep Option.  Each of these MMFs has a prospectus filed with the SEC, has a fundamental investment objective only changeable by shareholder vote, has a professional investment advisor responsible for investments, and a Board of Trustees responsible for supervising the advisor.  These are significant protections to ensure that investors be paid a reasonable rate.

---

[44] "Fidelity Highlights Benefits of Default Cash Options for Retail Accounts," by David Armstrong, Wealth Management, August 7, 2019, accessed at https://www.wealthmanagement.com/investment/fidelity-highlights-benefits-default-cash-options-retail-accounts; "Fidelity is Giving Customers Higher Rates on Cash. Here's Why.," by Daren Fonda, Barron's, August 9, 2019, p. 3, accessed at https://www.barrons.com/articles/fidelity-sweep-accounts-cash-rates-federal-reserve-schwab-merrill-lynch-vanguard-etrade-51565291732 (last viewed December 8, 2023).

[45] The SPAXX Prospectus is available at https://perma.cc/QA98-QP96 (last viewed December 8, 2023).

*Table 1: Money Market Funds With Automatic Sweep Option*

| | Company | Product | Ticker |
|---|---|---|---|
| [A] | Fidelity | Fidelity Govt Cash Reserves | FDRXX |
| [B] | Fidelity | Fidelity Treasury Fund | FZFXX |
| [C] | Fidelity | Fidelity Govt Money Market | SPAXX |
| [D] | Morgan Stanley | MS Active Assets Govt Trust | AISXX |
| [E] | Morgan Stanley | MS U.S. Govt MM Trust | DWGXX |
| [F] | Morgan Stanley | MS Inst Liq Govt Sec Part | MGPXX |
| [G] | Schwab | Schwab Treasury Oblig MF SwpCl | SNTXX |
| [H] | Schwab | Schwab Govt Money Market SwpCl | SWGXX |
| [I] | UBS | UBS RMA Govt MMF | RMGXX |
| [J] | Vanguard | Vanguard Federal Money Market Fund | VMFXX |
| [K] | Vanguard | Vanguard Treasury Money Market Fund | VUSXX |
| [L] | Wells Fargo | Allspring Government Money Market Fund | WFFXX |

184.     SPAXX (Fidelity) and VMFXX (Vanguard) paid, respectively, highs of 4.99%

(regardless of account balances) and 5.30% in 2023 (based on initial deposits exceeding $3,000).

185.     According to Crane Data's March 13, 2023 blog, at that time the "100 largest

taxable money funds had an average seven-day yield of 4.39% at the end of February."[46]

186.     In a letter to the SEC dated April 11, 2022, Fidelity Investments emphasized that

its clients strongly favor holding government money market funds over deposit accounts as

sweep options (at p. 25)[47]:

> Broker-dealers offer options for sweep vehicles, but the two most prevalent are
> government money market funds and bank deposits....  The majority of Fidelity's
> broker-dealer customers have elected one of eight Fidelity government money
> market funds as the sweep vehicle. In the two most popular Fidelity funds, over
> $450 billion, or approximately 90% of the funds' assets, represent investments
> made from the operation of the brokerage sweep.

---

[46] https://perma.cc/U9EX-FPXE (last viewed December 8, 2023).

[47] https://www.sec.gov/comments/s7-22-21/s72221-20123329-279620.pdf (last viewed December 8,
2023).

Offering a stable NAV fund as the sweep vehicle creates a simple, intuitive experience for retail brokerage customers. There are a number of reasons why a stable NAV fund is an attractive option for a sweep vehicle, including a straightforward customer experience in which the customer knows with confidence the amount available to spend, as well as the liquidity provided by a government money market fund. Because these investments are temporary and in anticipation of funding other activity, customers value knowing that the amount invested will not change. With our focus on ensuring we are meeting the needs of our customers and delivering better outcomes, Fidelity has engaged with retail customers frequently over the years through our extensive broker-dealer business. Based on these interactions, we know the value that customers place on the stability and predictability of government money market funds, including a stable NAV.

187.    Fidelity added (at p. 26) that

As noted above, government money market funds are a common investment option for brokerage sweep vehicles. If bank deposits become the preferred alternative to government funds, the transition of these assets would represent a massive influx into the banking system.

*       *       *

Such a substantial move away from government money market funds could significantly disrupt the smooth operation of the Treasury market, make deficit financing more difficult for the Treasury Department and negatively impact the Federal Reserve's exercise of monetary policy. Government money market funds are significant purchasers of Treasury debt. In total, government money market funds currently hold approximately 29% percent or $1.159 trillion of outstanding Treasury debt.  [footnote omitted] In addition, government money market funds are the primary participants in the Federal Reserve's Reverse Repurchase Agreement Facility, which has become an important tool for the central bank in managing the federal funds rate in an abundant reserve environment. Recently participation in this facility has exceeded $1.5 trillion.

188.    In its Final Regulations with respect to prime money market reforms,[48] the SEC noted (at p. 180) that as of March 2023, 78% of all money market funds were invested in government or treasury money market funds, comprising over 4.4 trillion in assets.

189.    The SEC emphasized (at p. 183) the stability of government and treasury MMFs:

---

[48] https://www.sec.gov/files/rules/final/2023/33-11211.pdf (last viewed December 8, 2023).

Government money market funds … tend to have counter-cyclical flows. Specifically, during times of market turmoil and volatility, investors – particularly institutional investors – tend to shift their investments to government money market funds. [footnote omitted.] These money market funds offer investments with high credit quality and liquidity, as well as an explicit guarantee for certain government securities (e.g., Treasuries) and a perceived implicit guarantee for others (*e.g.*, Federal Home Loan Bank securities). As shown below, these funds experienced inflows during the global financial crisis of 2008, Euro debt crisis of 2011, Covid-19 pandemic of 2020 and the bank crisis in 2023.

190.    In fact, the SEC observed (at 183) that treasury and money market funds were perceived as less risky than banks and that in a period of stress between February 1, 2023 and March 15, 2023, "$201 billion in bank deposits left the banking sector and $191 billion flowed into money market funds."

191.    Further, "[t]he rate at which deposits left the banking sector and flowed into the money market fund sector accelerated in March: between March 1 and April 5, 2023, $362 billion flowed into money market funds," *Id.*

192.    In an interview conducted of Peter Crane in a newsletter entitled "Income Matters Today" in an article entitled "Juicy Yields," Peter Crane was quoted as stating that government MMFs are no more risky that FDIC-insured deposit accounts: "Bank deposits … had a safety advantage, owing to the FDIC protection, but that's sort of shifted…. But now that money funds are almost entirely invested in government securities such as Treasuries, that safety differential has changed as well."[49]

193.    Crane, in that article, emphasized that investors, to get a "competitive yield" were migrating from FDIC-insured accounts to government MMFs:

**[Q.]  U.S money market fund assets have surged to $6 trillion. What's driving that?**

---

[49] https://perma.cc/WXP9-FN5N (last viewed December 8, 2023).

[A.]     The assets keep hitting records every day. Money market fund inflows show no signs of stopping. The retail flows are being driven by money trying to get a competitive rate. That's brokerage money moving out of bank sweep [accounts] and into money funds. It's also high net-worth money and institutional money coming in. Those 5% yields are definitely bringing in a lot of cash.

194.     MMFs are among the instruments that the Department of Labor considered comparable to deposit accounts in its 2003 Deutsche Bank ruling.

195.     The substantially higher yields offered by government MMFs as sweep options is strong evidence that the RASP rates paid by Merrill are not reasonable.

## CLASS ACTION ALLEGATIONS

196.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and (b)(3) on behalf of persons or entities who maintained Merrill Edge retirement accounts at any time beginning March 17, 2022 (the "Class").

197.     Plaintiff alleges an ongoing breach of contract.  Accordingly, the class period is ongoing.

198.     Excluded from the Class are Merrill, BANA, and BAC, officers or directors of Merrill, BANA, and BAC, and any of their heirs, successors, assigns, or spouses.

199.     Each of the elements of Fed. R. Civ. P. 23(a), 23(b)(2) and 23(b)(3) are established.

a.     The members of the Class are so numerous that joinder of all members is impracticable.

b.     While the exact number of members of the Class is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Merrill maintained billions of dollars of cash balances nationwide.  Plaintiff concludes that there are thousands of members of the Class.  Record owners and other members of the Class

may be identified from records through the Merrill Edge platform maintained by Merrill and may be notified of the pendency of this action by email, or publication.

        c.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Merrill's wrongful conduct complained of herein.

        d.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class litigation.

        e.     Merrill has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

        f.     Common issues of law or fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the common issues of law or fact that will predominate are:

        i.     The appropriate methodology to establish the reasonable rate of interest.

        ii.     Whether Merrill or Plaintiff has the burden of proving the reasonableness of Merrill's rates of interest.

        iii.     Whether Merrill fails to pay depositors a reasonable rate of interest on cash balances maintained in retirement brokerage accounts.

**CAUSE OF ACTION ON BEHALF OF ALL RETIREMENT
ACCOUNT CLASS MEMBERS FOR BREACH OF CONTRACT**

200.    Plaintiff repeats and realleges each of the allegations set forth in the foregoing paragraphs as if fully set forth herein.

201.    Merrill is contractually obligated to provide Plaintiff and Class Members with "no less than a reasonable rate" on retirement cash assets.

202.    Plaintiff and Class members have performed their contractual obligations.

203.    Merrill, in breach of its contractual obligations, failed to pay Plaintiff and Class Members a "reasonable rate" on cash assets.

204.    Plaintiff and other Class Members have been and continue to be injured from Merrill's breach of the contract requiring it to pay a "reasonable rate" on cash.

WHEREFORE, Plaintiff demands judgment on behalf of herself and other members of the Class as follows:

1.    Damages reflecting, at a minimum, the difference between the reasonable market rate to be determined by the trier of fact and the interest actually earned on cash accounts.

2.    Injunctive relief barring Merrill from continuing to pay an unreasonable rate of interest on retirement sweep accounts.

3.    Interest as a matter of law.

4.    Fees and expenses reasonably incurred in this Action, including attorney and expert fees.

5.    Such other and further relief as is just.

Dated:  December 11, 2023

**WOLF POPPER LLP**

By: */s/* Robert C. Finkel
     Robert C. Finkel
     Adam J. Blander
     Philip M. Black
     Antoinette Adesanya
     Emer Burke
     845 Third Avenue
     New York, NY 10022
     Tel: 212-759-4600

*Counsel for Plaintiff and the Putative Classes*